# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2023 Fall Term

_____

No. 22-ICA-4
No. 22-ICA-46

_____

PITA, LLC, AND MILAN PUSKAR REVOCABLE TRUST RESTATED 9/28/11,
Plaintiffs Below, Petitioners,

v.

SCOTT S. SEGAL,
Defendant Below, Respondent.

And

SCOTT S. SEGAL
Defendant Below, Petitioner,

v.

PITA, LLC, AND MILAN PUSKAR REVOCABLE TRUST RESTATED 9/28/11,
Plaintiffs Below, Respondents.

_____

Appeal from the Circuit Court of Monongalia County
Honorable Phillip D. Gaujot, Judge
Civil Action No. 18-C-372

AFFIRMED, in part, REVERSED, in part, and REMANDED

_____

Submitted: April 4, 2023
Filed: September 11, 2023

FILED

September 11, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

Ancil G. Ramey, Esq.
Anders W. Lindberg, Esq.
Steptoe & Johnson PLLC
Huntington, WV

Shawn A. Morgan, Esq.
Steptoe & Johnson PLLC
Bridgeport, WV

Tammie C. Alexander, Esq.
Steptoe & Johnson PLLC
Morgantown, WV

Counsel for PITA and Trust

Steven R. Ruby, Esq.
Raymond S. Franks, II, Esq.
Carey, Douglas, Kessler & Ruby, PLLC
Charleston, WV
Counsel for Segal

JUDGE SCARR delivered the Opinion of the Court.

SCARR, Judge:

All parties appeal from an order of the Circuit Court of Monongalia County entered on July 21, 2022, which granted partial summary judgment to PITA, LLC ("PITA") and Milan Puskar Revocable Trust Restated 9/28/11 ("the Trust"), granted partial summary judgment to Scott S. Segal ("Segal"), and entered judgment against Segal for $1,291,518.83 with post-judgment interest accruing at the statutory rate of 4%. PITA filed its notice of appeal on July 28, 2022 (22-ICA-4), while Segal filed his notice of appeal on August 22, 2022 (22-ICA-46). These appeals were subsequently consolidated for purposes of oral argument, consideration, and decision.

In 22-ICA-4, PITA and the Trust present three assignments of error, which may be summarized as follows:

1. That the Circuit Court erred in granting Segal's motion for summary judgment on PITA and the Trust's claims for fraud in the inducement.
2. That the Circuit Court erred in granting Segal's motion for summary judgment on PITA's claim for breach of contract.
3. That the Circuit Court erred in crediting Segal with the full amount of a partially funded settlement between PITA and one of Segal's co-guarantors regarding the Trust's contribution claim.

In 22-ICA-46, Segal raises three assignments of error, which may be summarized as follows:

1. That the Circuit Court erred in granting the Trust summary judgment on its claim for contribution because any obligation under Segal's guaranty was allegedly

1

discharged through either the doctrine of supervening frustration of purpose or alteration of principal's duties or obligations.[1]

2. That the Circuit Court erred in holding Segal equally liable in contribution with the Trust for the unpaid balance on the note after subtracting the settlements with a co-guarantor, Leonard P. Harris ("Harris"), and the estate of a co-guarantor, Stanley M. Hostler ("Hostler Estate").[2]

3. That the Circuit Court erred in granting the Trust summary judgment on Segal's counterclaim for breach of contract.

For reasons stated below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

This case revolves around certain guaranties which were given to secure a $3 million loan which Protea Biosciences, Inc. ("Protea") obtained from Centra Bank ("Centra"), now United Bank ("United"). Protea was a bio-analytic technology company formed by researchers and scientists affiliated with West Virginia University. Protea used mass spectrometry to identify biomolecules in the analysis of biological processes with the hope that this research would further our understanding of certain diseases and perhaps even lead to a cure for cancer.

---

[1] In Section D of our Discussion, we conclude that the Trust did not have a claim for contribution because it did not pay the Protea note. Our decision that the Trust does not have a viable claim for contribution does not moot Segal's discharge arguments because they are equally applicable to PITA's breach of contract claim based on Segal's guaranty. Consequently, we address Segal's discharge arguments in connection with PITA's claim for breach of contract in Section E of our Discussion.

[2] Mr. Hostler died on June 11, 2017. Throughout this opinion, when referring to Mr. Hostler personally, rather than his estate, we use "Hostler."

In 2009, Protea obtained a working capital line of $3 million from Centra. On August 27, 2009, Milan Puskar ("Puskar"), Harris, and Hostler each signed guaranties for this loan in the principal amount of $1 million plus related interest, costs, expenses, and attorney fees. About one month later, on September 28, 2009, Segal signed an identically worded guaranty, also in the principal amount of $1 million plus related interest, costs, expenses and attorney fees.[3] Each of the guaranties purported to be absolute and unconditional, and stated that nothing but a full payment and discharge of the Protea loan would release the liability of the guarantor.[4] In addition to containing a general waiver of possible defenses, the guaranties contained express waivers of specific defenses, such as settlement with and release of co-guarantors,[5] modification of the underlying contract

_____

[3] Paragraph 4 of the Guaranty signed by Segal states that in addition to a principal amount of $1 million, he shall be liable for "accrued interest thereon and all other costs, fees, and expenses agreed to be paid under all agreements evidencing the indebtedness and securing the payment of the indebtedness, and all attorney fees, collection costs and enforcement expenses referable thereto."

[4] Paragraph 1 of the Guaranty signed by Segal states in part that "no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Undersigned or modify, reduce, limit or release the liability of the Undersigned hereunder." See also Paragraph 7 ("The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to indebtedness, except the defense of discharge by payment in full.").

[5] Paragraph 6 of the Guaranty states in part that: "The liability of the Undersigned shall not be affected or impaired by … any full or partial release of, settlement with, or agreement not to sue, Borrower or any other guarantor or other person liable in respect of indebtedness…"

between creditor and debtor,[6] and impairment of collateral that might otherwise be available if Protea defaulted on its loan and the bank attempted to collect from the guarantors.[7] Each guaranty also provided for the recovery of costs and expenses, including reasonable attorney fees, incurred in enforcing the guaranty.[8] Neither the guaranties nor any other document signed by the guarantors specified how their contributive shares should be allocated among themselves in the event that Protea defaulted on its loan.[9]

---

[6] Paragraph 6 of the Guaranty states in part that: "The liability of the Undersigned shall not be affected or impaired by… any modification of the interest rates, maturities or other contractual terms applicable to indebtedness…"

[7] Regarding the impairment of collateral, Paragraph 6 of the Guaranty states in part that "the liability of the Undersigned shall not be affected or impaired by… any failure to obtain collateral security…for indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security…"

[8] Paragraph 5 of the Guaranty signed by Segal states that: "The Undersigned will pay or reimburse Lender for all costs and expenses (including reasonable attorney's fees and legal expenses) incurred in connection with the protection, defense or enforcement of this guaranty in any litigation or bankruptcy or insolvency proceedings."

[9] As discussed in Section D of our Discussion, when a co-guarantor or co-surety pays more than his fair share of a joint obligation, he is entitled to seek contribution from his co-obligors to recover the excess of what he paid. The amount which a co-obligor is responsible for in relationship to his fellow obligors is known as his "contributive share." In some cases, co-obligors agree in advance on what their contributive shares will be when and if the principal defaults. In this case, however, the parties did not specify in advance and have been unable to agree on how their respective shares of the Protea debt should be determined. Therefore, they cannot agree on what Segal's responsibility should be, among themselves, for the unpaid portion of the Protea debt.

Approximately one year later, on July 30, 2010, the Trust, acting through Puskar, executed an additional guaranty for $3 million to secure Protea's note. The Trust also subsequently entered into a Commercial Security Agreement with United (Centra's successor). Neither this new guaranty nor the security agreement stated that they were absolving Segal, Hostler, Harris, or Puskar as guarantors. However, Hostler and Harris later claimed that shortly before his death on October 7, 2011, Puskar essentially told them (after the additional guaranty was given by the Trust) that this additional guaranty was part of his intention that he would pay the obligation in full should Protea default. Harris and Segal also indicated that they believe that Puskar also told Centra of his intention, although the loan officer for the Protea loan testified when deposed that no such conversation had taken place. There is no evidence in the record of Puskar executing any documents to memorialize or implement this alleged intention to protect the other guarantors in the event of Protea's default. Nor is there any evidence of record that Segal, Harris, or Hostler ever requested an additional guaranty or were even aware of it when it was executed.

On or about November 6, 2011, about a month Puskar died, the Trust delivered 500,000 shares of Mylan Laboratories, Inc. stock to Centra as collateral for various loans it had guaranteed. On July 1, 2013, the Trust and United Bank (Centra's successor) entered into a Security Agreement concerning the Protea line of credit as well as other loans, including loans referenced as "Mermaid, LLC" and "Platinum," where the Trust was a guarantor and had pledged stock held in a brokerage collateral account to serve

5

as security. The security agreement confirmed the pledge of a brokerage collateral account as security for these guaranties and loans.

In 2017, United determined that a Change in Terms Agreement (CTA) was necessary because of a change in collateral (by this time, much of the stock in the brokerage account had been converted to cash and placed in a money market account). The Trust and all the individual guarantors (Puskar, Harris, Hostler and Segal) signed the CTA, which contained an "Other Responsible Parties" clause confirming that the individual guarantors were not relieved of their obligations should Protea default. The CTA also contained an "Oral Agreements Disclaimer" paragraph stating that: "This Agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties."

On November 21, 2017, the Trust filed papers with the West Virginia Secretary of State's Office to create PITA. On the same day, PITA purchased the Protea note from United for $3 million plus the accrued interest with funds provided by the Trust, and United Bank transferred and assigned Protea's Commercial Promissory Note, the guaranties, the CTA, and other related documents to it. PITA then notified the Bank that it was releasing its security interest in the collateral posted by the Trust and directed United Bank to return that collateral to the Trust.

6

On December 1, 2017, Protea filed bankruptcy in the Northern District of West Virginia. A week later, on December 8, 2017, PITA informed Segal, Harris, and the Hostler Estate that Protea was in default and that PITA expected them to honor their guaranties. When Segal, Harris, and the Hostler Estate refused to do so, PITA and the Trust filed a lawsuit against them in the Circuit Court of Monongalia County. Segal, Harris, and the Hostler Estate counterclaimed for fraudulent inducement and breach of contract. The Hostler and Harris Estates[10] settled with PITA and the Trust, leaving Segal as the sole remaining defendant.[11] After protracted litigation, on July 21, 2022, the lower court entered an Order Granting Partial Summary Judgment to Plaintiffs, Granting Partial Summary Judgment to Segal, and Entering Judgment Against Defendant Segal. All parties appeal from this order.

## II. Standard of Review

"In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject

---

[10] Harris died after this case was filed.

[11] On or about January 7, 2022, the Harris Estate settled PITA's claim on its guaranty for $537, 500.00. Thereafter, on February 9, 2022, the Hostler Estate also settled with PITA for $537, 500.00 but its settlement consisted of $175, 000.00 in cash plus 90% of any attorney fees received by the Hostler Estate from certain asbestos cases Hostler was processing before his death. As a result of these settlements, both the Harris and Hostler Estates were dismissed as defendants from the case.

to a *de novo* review." Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W. Va. 108, 492 S.E. 2d 167 (1997). Decisions to grant or deny summary judgment are reviewed *de novo*. Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E. 2d 755 (1994).

## III. Discussion

### A. *PITA and Trust Claims Against Segal for Fraudulent Inducement*

In their complaint, PITA and the Trust asserted that Segal was guilty of fraudulent inducement because they claim he had never intended to honor his obligations if Protea defaulted when he signed his guaranty for $1 million in 2009. After some discovery, they also asserted that Segal had acted fraudulently when he signed the CTA in 2017. According to them, Segal falsely represented that there were no oral agreements with other parties, although he subsequently argued that Puskar had orally promised to protect them from liability. The lower court granted Segal summary judgment on the PITA and Trust fraud claims, concluding that such claims could not be based on a mere failure to perform a promise, that their claims could not meet the clear and convincing standard for fraud,[12] and that there were no "identifiable damages" with respect to the fraud claim

---

[12] To prove fraud, a plaintiff must establish "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." Syl. Pt. 1, *Lengyel v. Lint*, 167 W. Va. 272, 280 S.E. 2d 66 (1981). These elements must be proven by "clear and convincing evidence." Syl. Pt. 5*, Tri-State Asphalt Prods. Co. v. McDonough Co.*, 182 W. Va. 757, 391 S.E.2d 907 (1990).

8

because it "simply mirror[ed] the damage claims in the breach of contract and contribution claims."

We reject the lower court's reasoning that the fraud claim involved the same damages as the breach of contract and contribution claims because some damages could be recovered in a fraud claim that were not available with the other claims. If PITA and the Trust could prove sufficiently egregious misconduct, they might be able to recover punitive damages and perhaps even attorney fees in connection with their tort claim for fraud. *See* Syl. Pts. 3 & 5, *Muzelak v. King Chevrolet, Inc.*, 179 W. Va. 340, 368 S.E. 2d 710 (1988) (punitive damages and attorney fees are available in common law actions for fraud); s*ee generally* Syl. Pt. 4, *Mayer v. Frobe*, 40 W. Va. 246, 22 S.E. 58 (1895)("In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear…the jury may assess exemplary, punitive, or vindictive damages…"); Syl. Pt. 4, *Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.*, 188 W. Va. 468, 425 S.E. 2d 144 (1992) ("Where it can be shown by clear and convincing evidence that a defendant has engaged in fraudulent conduct which has injured a plaintiff, recovery of reasonable attorney's fees may be obtained in addition to the damages sustained as a result of the fraudulent conduct."). The same range of damages would not be available for breach of contract or contribution claims, however. *See Berry v. Nationwide Mut. Fire Ins. Co.*, 181 W.Va. 168, 175, 381 S.E. 2d 367, 374 (1989) (punitive damages are not available in actions for breach of contract unless there is

an independent tort); *In Re Wetzler,* 192 B.R. 109 (Bank. Ct. D. Md. 1996) (absent an agreement to the contrary, attorney fees are not available in actions for contribution).

We agree with the lower court that mere failure to perform a promise will not establish a claim for fraud. *See Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP,* 231 W. Va. 577, 585, 746 S.E. 2d 568, 576 (2013) (per curiam) ("Fraud cannot be predicated on a promise not performed. To make it available there must be a false assertion in regard to some existing matter by which a party is induced to part with his money or his property.") However, we also recognize that a promise made with no intention of performing it may be sufficient to support a claim for fraudulent inducement. *See* Syl. Pt. 3, *Traders Bank v. Dils*, 226 W. Va. 691, 704 S.E. 2d 691 (2010); Syl. Pt. 1, *Dyke v. Allman*, 130 W. Va. 519, 44 S.E. 2d 587 (1947); Syl. Pts. 2 & 3, *Davis v. Alford*, 113 W. Va. 30, 166 S.E. 701 (1932); *Bluestone Coal Corp. v. CNX Land Res.*, *Inc.*, Civil Action No. 1:07-00549, 2007 WL 6641647 at *5 (S.D. W. Va. Nov. 16, 2007)(memorandum opinion and order); *Poth v. Russey*, 99 F. App'x 446, 453 (4th Cir. 2004) (per curiam) (applying West Virginia law). In this case, however, there is no evidence in the record regarding Segal's intentions when he signed his guaranty in 2009. Moreover, during oral argument, PITA and the Trust did not rely on the 2009 guaranty to support their claim for fraudulent inducement, basing their argument solely on the 2017 CTA.

Regarding the claim that Segal falsely affirmed on the CTA that he had no oral agreements with other parties, we find that there was no contract between Segal and

Puskar and/or the Trust which required the Trust to provide a guaranty or collateral, or otherwise to protect Segal in general should Protea default.[13] Therefore, the statement in the CTA that there were no oral agreements with other parties was not false, and cannot provide the basis for a fraudulent inducement claim. Accordingly, we agree with the lower court's order granting summary judgment in favor of Segal on the fraudulent inducement claim asserted by PITA and the Trust.

## B.  PITA Claim Against Segal for Breach of Contract

PITA claims that it should be able to recover against Segal for breach of contract because it acquired the guaranty given by Segal when it purchased Protea's note. The lower court rejected this claim, concluding that PITA was the same as the Trust, and therefore it was limited to the remedy available to a co-guarantor such as the Trust, in other words, to contribution.[14] The practical effect of the lower court's ruling was to prevent PITA from recovering contractual interest, late fees, and collection expenses (including attorney fees) if it prevailed.

---

[13] Our rationale for holding that there was no contract between Segal and the Trust is set out in Section G of our Discussion, where we address Segal's breach of contract counterclaim since these issues overlap.

[14] Ruling from the bench, the lower court originally recognized a cause of action for breach of contract, then, sua sponte, reversed itself. This "about face" occurred even though the parties had a joint pretrial stipulation that PITA "purchased" the Protea loan and Segal had argued that the Trust was not entitled to contribution because it had not paid any of the Protea debt.

11

As a general rule, absent an agreement to the contrary, attorney fees are not recoverable in an action for contribution. *See Appleford v. Snake River Mining, Milling & Smelting Co.*, 210 P. 26, 30 (Wash. 1922); *In Re Wetzler,* 192 B.R. 109 (Bank. Ct. D. Md. 1996). Similarly, interest is usually only available at the legal rate on judgments. *See Exch. Elevator Co. v. Marshall*, 22 N.W. 2d 403, 413 (Neb. 1946); *Appleford,* 210 P. 26, 30 (Wash. 1922)*; Bushnell v. Bushnell,* 46 N.W. 442, 444 (Wis. 1890)*;* 18 Am. Jur. 2d *Contribution* §107, Westlaw (database updated May 2023); 38A C.J.S. *Guaranty* §159, Westlaw (database updated August 2023).

PITA argues on appeal that the defense of alter ego/veil piercing was never asserted, developed, briefed, argued, or analyzed in the lower court. For reasons stated below, we hold that PITA, as an assignee of Segal's guaranty, was entitled to bring an action for breach of contract, but that its recovery on the Protea debt was limited to what the Trust would have been entitled to recover by way of contribution.[15] Furthermore, we hold that PITA would be entitled, under the terms of the guaranty, to recover contractual interest, late fees, and legal expenses including attorney fees. Finally, we hold in Section E of this opinion that Segal's guaranty was not discharged through such defenses as

---

[15] Our conclusion that PITA can bring an action against Segal for breach of contract based on his guaranty necessarily means that the Trust cannot recover for contribution, as we discuss in Section D of our Discussion. Given the facts of this case, if PITA's debt was purchased, rather than paid, then the Trust is not entitled to contribution because it has not paid its contributive share. Indeed, it has paid nothing.

supervening frustration of purpose, alteration of the principal's duties and obligations, impairment of collateral, or otherwise acting in a way injurious to a guarantor.

The parties agree that anyone, including Segal, could have purchased Protea's loan. When PITA purchased the underlying obligation, it also acquired the guaranties by Hostler, Harris, and Segal. As a general rule, guaranties are freely assignable, absent express language to the contrary in the documents. 38 Am. Jur. 2d *Guaranty* §21, Westlaw (database updated May 2023): 38A C.J.S. *Guaranty* §§48 & 49, Westlaw (database updated August 2023); Peter Alces & Susan Siegler-Grimm, *The Law of Suretyship and Guaranty*, §1.5 Westlaw (database updated June 2023); Restatement (Third) of Suretyship & Guaranty §13 Westlaw, (Am. L. Inst. 1996). In the present case, there is no language in the guaranties which prohibits their assignment or discharges the guarantors in the event of an assignment. Indeed, Paragraph 13 of the guaranties expressly states that they "shall inure to the benefit of Lender and is participants, successors and assigns."

As the parties acknowledge, it is not unusual for a guaranty or surety[16] to purchase the underlying debt. Courts are split, however, on whether the guaranty or surety

---

[16] "Guaranty" and "surety" are often used interchangeably. Both terms involve a promise to pay the debt of another. A surety involves an obligation which is direct and primary, while a guaranty involves an obligation which is secondary and collateral. Syl. Pt. 1, *Kearnes v. Montgomery*, 4 W. Va. 29 (1870), *see* Syl. Pt. 1, *Gateway Commc'ns, Inc. v. Hess*, 208 W. Va. 505, 541 S.E. 2d 595 (2001); Syl. Pt. 2, *Middle States Loan, Bldg. &*

may then sue its co-obligors on their guaranty or suretyship agreements, with some courts holding that the purchasing entity may bring an action on the contract, while other courts hold that the purchasing entity is limited to an equitable action for contribution. Brian D. Hulse, *After the Guarantor Pays*: *The Uncertain Equitable Doctrines of Reimbursement, Contribution, and Subrogation,* 51 Real Prop. Tx. & Est. L. J. 41, 61-2 (2016); *see Sterling Sav. Bank v. Emerald Dev. Co.*, 338 P.3d 719, 727-29 (Or. 2014)(gathering cases). When a co-obligor may seek relief under either a contract theory or a contribution theory, it must elect which remedy it will pursue. *See* Syl. Pt. 1, *Frantz v. Page*, 426 N.W.2d 894 (Minn. Ct. App. 1988).

Those courts which recognize the right to bring a contract action on the guaranty or suretyship agreement typically limit the plaintiff's recovery to the contributive share it would be entitled to in an action for contribution. *See In Re Pirani, 824 F. 3d 483* (5th Cir. 2016); *Antaramian Props., LLC v. Basil St. Partners, LLC,* No. 9:11-bk-195010-FMD, 2012 WL 6101914 (M.D. Fl. Dec. 7, 2012); *Backman v. Hibernian Holdings, Inc.,* No. 96 Civ. 9590(LAP), 1998 WL 427675 (S.D. N.Y. July 28, 1998) (memorandum and order); *Mandolfo v. Chudy,* 564 N.W. 2d 266 (Neb. Ct. App. 1997); *Albrecht v. Walter,* 572 N.W. 2d 809 (N.D. 1997); *Sterling Sav. Bank ex rel. Northwest Lending Partners, LLC*

---

*Constr. Co.*, 45 W.Va. 588, 31 S.E. 921 (1898). In most situations, the law governing these two kinds of obligation is similar if not the same. *See* Laurence P. Simpson, Handbook on the Law of Suretyship 16 (1950) ("in most cases the legal consequences of suretyship and guaranty are the same…"), 18 ("… it is generally unnecessary to distinguish between suretyship and guaranty.").

*v. Emerald Dev. Co.*, 338 P.3d 719 (Or. 2019); *see generally* Restatement (First) of Restitution §85 comment a (Am. L. Inst. 1937) (A surety or other co-obligor … is entitled to no more by way of contribution than will put him on an equality of loss with others in view of his share of the obligation undertaken. This is true even though he obtains an assignment from the creditor…").

Thus, "[a] coguarantor's purchase of a promissory note and guaranties, and a creditor's assignment of its rights under those instruments to the coguarantor, does not extinguish the obligation, and instead, the coguarantor, as assignee of the creditor, can maintain an action to enforce the guaranty agreements against the coguarantors; however, equitable principles limit the guarantor-assignee's recovery against the coguarantors to their pro rata contributive share of what the purchasing-guarantor paid the creditor."). 38 Am. Jur. 2d *Guaranty* §74, Westlaw (database updated May 2023).

Courts which allow a co-obligor to bring a contract action have split on whether attorney fees and interest may be recovered under the guaranty or surety agreement. *Compare Est. of Frantz v. Page*, 426 N.W. 2d 894, 901-02 (Minn. Ct. App. 1988) (allowing recovery of interest at contract rate) *with Collins v. Throckmorton*, 425 A. 2d 146, 151-52 (Del. 1980) (recovery of attorney fees and interest at contract rate was not allowed) *and Weitz v. Marram*, 366 A.2d 86, 90 (Md. Ct. Spec. App. 1976) (disallowing recovery of attorney fees under guaranty assigned to co-guarantor).

In the present case, the Trust did not purchase the Protea note itself; instead, it furnished PITA with funds to purchase the debt. Segal argues that PITA was nothing but the alter ego of the Trust which created it, and therefore should be limited to the Trust's equitable remedy of contribution. We hold, however, that the Trust would have been able to purchase the note and bring a cause of action under Segal's guaranty, albeit its recovery on the principal would have been limited to its contributive share. Therefore, PITA can also recover the Trust's contributive share under Segal's guaranty even if it is the alter ego of the Trust.[17] *See Sterling Sav. Bank ex rel. Northwest Lending Partners, LLC v. Emerald Dev. Co.*, 338 P.3d 719, 737 (Ore. Ct. App. 2019) (holding that a straw buyer controlled by a guarantor can enforce guaranties of other guarantors, but only to the extent of their individual contributive shares). Furthermore, we hold that the Trust would have been able to recover contract interest[18] and attorney fees under the guaranty, and therefore PITA

---

[17] If PITA were not the alter ego of the Trust, it would be entitled to recover the full amount of the Protea obligation from Segal, up to the $1 million limit of his guaranty. Because PITA is not seeking to recover more than Segal's contributive share, however, we need not determine whether PITA is the alter ego of the Trust for purposes of this appeal, or whether that issue was adequately raised in the lower court. Although we do not decide the issue, we note that the corporate veil should not be lightly disregarded. *See generally S. Elec. Supply Co. v. Raleigh Cnty. Nat. Bank*, 173 W.Va. 780, 787, 320 S.E. 2d 515, 522 (1984).

[18] In *Est. of Frantz v. Page*, 426 N.W.2d 894 (Minn. Ct. App. 1988), the court discussed whether interest in an action brought pursuant to a guaranty, rather than for contribution, would be governed by the interest rate set forth in the underlying note, or by the statutory interest rate. It concluded that when a co-guarantor agrees to be liable for "both the principal sum and interest, the guarantor is liable for interest at the contract rate. *See Craftique, Inc. v. Stevens & Co., Inc.*, 321 N.C. 564, 364 S.E. 2d 129, 132-33 (1988)." *Id.* at 901. The Frantz court went on to say:

should be able to do so as well.[19] If Segal had wanted to avoid liability for contractual interest, late charges, and attorney fees, he could have paid his contributive share (or any part of it not in dispute) when asked to do so, or negotiated an acceptable settlement, instead of litigating this matter for five years.

## C. Reduction of Balance for Full Amount of Partially Funded Settlement by Co-Guarantor

The Hostler Estate settled with PITA for $537,500, which consisted of $175,000 in cash plus 90% of any attorney fees received by the estate on certain asbestos

---

> By their written guaranties, the shareholders expressly contracted to be bound to the interest rate set forth in the note. Receiving an assignment of the note and guaranties, the estate, as a creditor, brought an action at law to enforce the guaranties; it did not bring an equitable action for contribution. Therefore, the language of the express contracts (guaranties) controls, and this court need not speculate about any implied contract among the coguarantors.

*Id*. at 901-02. In this case, the Protea note set forth a certain interest rate. In Paragraph 4 of his Guaranty, Segal agreed to be liable for $1 million of principal plus accrued interest on the Protea note.

[19] Our holding regarding the recovery of attorney fees is in keeping with the general rule recognized by our high court that "[a]n award of attorney's fees is appropriate where the governing document contains a provision allowing for the recovery of such fees." *Tuckwiller v. Tuckwiller*, No. 19-0345, 2020 WL 598336, at *2 (W. Va. Feb. 7, 2020) (memorandum decision). *See also Moore v. Johnson Serv. Co.*, 158 W. Va. 808, 820-22, 219 S.E. 2d 315, 323-24 (1975) (holding that prevailing party should be granted attorney fees as provided for in a commercial lease agreement).

cases up to $362,500.[20] The lower court held that the balance owing on the Protea note was reduced by the full amount of the Hostler Estate's $537,500 settlement even though none of the potential $362,500 in contingent attorney fees might ever be recovered. The Trust contends that the balance should have been reduced by only the $175,000 in cash actually paid at the time of settlement, with Segal to receive a refund if additional settlement funds were paid by the Hostler Estate; otherwise, it contends, Segal will receive a windfall if the estate does not pay all of the additional $362,500. Segal contends that PITA should bear the risk that it may not receive additional funds from the Hostler Estate because it, not Segal, negotiated the settlement with the estate. Both parties rely on the Restatement (Third) of Suretyship and Guaranty §57 (Am. L. Inst. 1996), while drawing different conclusions therefrom.

Section 57(1) of the Restatement states the general rule that the contributive share of a cosurety "is the aggregate liability of the cosureties to the obligee divided by the number of cosureties." This general rule of equality is subject to exceptions, such as factors which limit the ability of a cosurety to pay its fair share. Both parties refer the court to 57(2)(b) which states that:

> When, because of insolvency, lack of personal jurisdiction, or other reasonable circumstances, the contribution obtained from a cosurety after reasonable collection efforts is less than that cosurety's contributive share, the contributive shares of the other cosureties as among themselves are recalculated pursuant to subsection (2)(a) as though the secondary obligation of the

---

[20] Harris settled for $537,500 in cash, the same amount as the Hostler Estate settlement, with the only difference being the method of payment.

former cosurety limited its liability to the contribution obtained from that cosurety.

In its brief, the Trust argues, apparently relying on the "reasonable circumstances" language of this subsection, that PITA "has recovered only $175,000 from the Estate of Hostler and that the Estate currently has no additional assets to use to pay its remaining $362,500 obligation." Thus, the remaining $362,500 is uncollectible, and should be evenly reallocated among the two remaining guarantors, Segal and the Trust.

Segal, for his part, contends that the Hostler Estate is not insolvent and that the plaintiffs have not established that they will never be able to recover the balance of the settlement with the estate. Moreover, although he acknowledges the risk that the remaining balance of the Hostler Estate settlement may never be recovered, he argues that PITA should bear that risk as the party which negotiated the settlement. The lower court found this argument to be persuasive.

We agree that PITA should bear the risk inherent in its settlement with the Hostler Estate because Segal played no part in negotiating, and did not consent to, the settlement with the Hostler Estate and had no ability to object to or prevent the settlement.

Therefore, the amount of Protea's debt was properly reduced by the full amount of that settlement ($537,500.00), including both money paid and potential future payments.[21]

Our conclusion that the full amount of the settlement should be used is supported not only by considerations of equity and fairness, but by the general policy that settlement should be encouraged. *See* Syl. Pt. 1, *Sanders v. Roselawn Mem'l Gardens, Inc.*, 152 W. Va. 91, 159 S.E. 2d 784 (1968). This policy is furthered when a party who settles in good faith is protected from contribution by other parties with whom it may be jointly liable. The principle that a party who settles in good faith prior to judgment should not be subject to contribution has been recognized in cases involving tortfeasors who were jointly and severally liable. *See* Syl. Pt. 6, *Bd. of Educ. of McDowell Cnty. v. Zando, Martin & Milstead, Inc.,* 182 W. Va. 597, 390 S.E.2d 796 (1990)(superseded by statute).[22] We

---

[21] As previously noted, the estate paid $175,000 up front, with a promise to pay additional sums from attorney fees received by the estate from asbestos settlements. During oral argument, the court was informed that the Hostler Estate had received some funds from the claim it filed in the Protea bankruptcy, and that it intended to pay that money to PITA.

[22] In tort cases, the right to contribution has been largely abolished by statute. *See WW Consultants, Inc. v. Pocahontas Cnty. Pub. Serv. Dist.,* 248 W.Va.323, ___, 888 S.E. 2d 823, 842 (2023) ("… the Legislature has made clear that, outside of exceptions recognized in this statutory scheme [W.Va. Code 55-7-13a to -13d], contribution is no longer available."). The abolition of contribution claims which fall outside the statutory scheme is related to the fact that most tort claims now involve several, rather than joint and several, liability. In situations where joint and several liability continues to apply, the right to contribution still exists when a party pays more than its share of a joint liability. Moreover, parties may still provide for contribution or indemnity by contracts among themselves. *Id.* at ___, 888 S. E. 2d at 841.

20

believe that the same rule should obtain in other cases involving co-obligors.[23] Because

Segal is precluded from seeking contribution against the Hostler Estate by PITA's

settlement with the estate, Segal should receive the benefit of the full amount of that

settlement, including the amount attributed to possible future asbestos settlements received

by the estate.

### D. The Trust Claim Against Segal for Contribution

As a co-guarantor with Segal, the Trust claims that it is entitled to

contribution because it paid more than its share of the remaining balance on the Protea

note. As a general rule,[24] a guarantor who pays more than his or her contributive share of

an obligation is entitled to contribution from his or her co-guarantors. *See* Syl. Pt. 3, *Beverly*

*v. Thompson*, 229 W. Va. 684, 735 S.E. 2d 559 (2012) (per curiam); *Est. of Bayliss v. Lee*,

173 W. Va. 299, 303, 315 S.E. 2d 406, 410 (1984). In this case, however, the Trust did not

---

[23] Courts in other jurisdictions have recognized that settling co-guarantors are protected from contribution by non-settling co-obligors where the guaranties contain language similar to the guaranties in this case authorizing the principal to settle with or release co-obligors. *See United States v. S. Cycle Accessories, 567 F.2d 296, 298 (5th Cir. 1978) (per curiam); Immordino v. Costa,* 534 F.2d 1378, 1382 & n.3 (10th Cir. 1976). *But see First American Bank of N.Y. v. Fallova Shredder Co., Inc.*, 587 N.Y.S.2d 119, 120-121 (1992).

[24] In this case, Paragraph 10 of the guaranties signed by the Trust and the other guarantors contained language providing that the guarantors were not entitled to contribution from co-guarantors until **all** of the underlying obligation had been satisfied, and not just when the guarantor has paid more than its contributive share. We need not address the validity or effect of such provisions in this matter because the Trust has not paid *any* of the Protea loan.

pay any money to satisfy the Protea loan, either in whole or in part. Instead, it provided

funds to PITA to purchase the loan from the United. The loan was not extinguished; it was

assigned to PITA, which then sued Segal on his guaranty.[25] The Trust was not entitled to

contribution against Segal because it had not paid more than its contributive share. Indeed,

at this point, it has not paid anything to satisfy the Protea obligation.[26] "An action for

contribution against a cosurety is premature when the first cosurety has not yet personally

paid any portion of the debt." Peter Alces & Susan Sieger-Grimm, *The Law of Suretyship*

---

[25] All of the parties to this action stipulated in the lower court that the Protea loan was purchased, rather than paid. *See*, *e.g.*, Joint Pretrial Memorandum, Stipulation of Uncontested Facts, Paragraph 6 ("…the Plaintiff, PITA, LLC ["PITA"], purchased the Protea Note from the Bank for $3,026,904.16."). Indeed, the complaint jointly filed by PITA and the Trust asserts that the loan was purchased by PITA rather than being paid by the Trust. We also note that Lori Maynard, Operations Manager for the Trust, testifying in her deposition as a corporate representative for PITA, stated that the Trust had not paid any of the Protea note. In its order, however, the lower court declared that "[p]ayment of the Note balance…by PITA/Trust, was a satisfaction of the Note as far as United Bank was concerned.…" Although the purchase of the note may have ended United's interest in this loan, even United did not treat the purchase as a satisfaction because it assigned the promissory note, CTAs, and guaranties to the purchaser, PITA. Paragraph 2(a) of this assignment provides in pertinent part that "no payment has been received by the Assignor, or by any third party claiming through Assignor, in full or partial satisfaction of the balance due and owing on the Note…" Clearly, PITA did not tender money to United with the intent to extinguish Protea's debt, and United did not accept it for that purpose.

[26] We recognize that many courts treat the purchase of a loan by a secondary obligor as a satisfaction thereof so that the guaranty or surety may recover its contributive share from co-guarantors. Given the facts of this particular case, however, we conclude that it is more appropriate to treat what happened as a purchase, rather than a satisfaction, of the Protea loan. *See Blue Water Bay at Center Hill, LLC v. Hasty*, No. M2020-01336-COA-R3-CV, 2023 WL 419907, at *5 (Tenn. Ct. App. June 26, 2023). In any event, PITA and the Trust cannot have it both ways. The transaction in this case cannot be both a purchase and a satisfaction of the Protea loan. *Id.at *6.* PITA and the Trust could not both have viable claims against Segal unless the Trust paid more than its contributive share, but less than the full amount of the Protea debt.

*and Guaranty* §5.5 n. 23 (June 2023 update).[27] *See also* 4B Michie's Jurisprudence of Virginia and West Virginia *Contribution and Exoneration* §15 at 15 (2019) ("…a surety is not entitled to a judgment against his cosurety until he has paid more than his part of the debt of the principal.").

### E. *Alleged Discharge of Segal Guaranty*

Segal asserts that he is not liable under his guaranty because his obligations were discharged through the defenses of "supervening frustration of purpose"[28] and "alteration of the principal's duties and obligations."[29] The Trust responds that neither of

---

[27] Under W. Va. Code §45-1-6 (1923), a party may obtain contribution from a co-obligor when a judgment or decree has been entered against it even before payment has occurred, but no judgment has been entered against the Trust is this case, so this statute does not apply.

[28] In *Waddy v. Riggleman*, 216 W. Va. 250, 257 n.9, 606 S.E. 2d 222, 229 n. 9 (2004), the Supreme Court of Appeals of West Virginia discussed the doctrine of supervening frustration, which it described as "[a] companion to the rule of impracticability," quoting the Restatement (Second) of Contracts §265 (Am. L. Inst. 1981) for the proposition that: "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Although noting that "discharge by supervening frustration" was "widely recognized," the Court did not explicitly adopt it, relying instead on the doctrine of impracticability.

[29] West Virginia has long recognized that a modification of the principal's obligation can discharge a secondary obligor such as a guarantor or surety if the secondary obligor did not consent to the change. *See* Syl. Pt. 1, *Leonard v. Cnty. Ct. of Jackson Cnty.*, 25 W.Va. 45 (1884). In the early days, this rule was strictly enforced, and even a change that was beneficial to the obligor could result in discharge. *Id*. at 52. The more modern rule is

23

these defenses were raised in the lower court and therefore should not be considered for the first time on appeal. The Trust also argues that even if this Court decides to address these defenses, they fail for two reasons: (a) they were waived by language in the guaranty, and (b) assuming they were not waived, they are not supported by the facts.[30]

Failure to raise an issue in the lower court does not deprive this Court of jurisdiction to address that issue. *Louk v. Cormier*, 218 W. Va. 81, 86, 622 S.E. 2d 788, 793 (2005); *State v. Green*, 196 W. Va. 500, 505-06, 473 S. E. 2d 921, 926-27 (1996) (Cleckly, J., concurring). As a general rule, however, an appellate court will not consider an issue raised for the first time on appeal. *See* Syl. Pt. 2, *Sands v. Sec. Trust Co.*, 143 W. Va. 522, 102 S.E.2d 733 (1958). Exceptions to this rule include issues involving subject

that the obligor will only be released to the extent of its injury. *See Gregoire v. Lowndes Bank*, 176 W.Va. 296, 300, 342 S.E. 2d 264, 268 (1986) (per curiam); Restatement (Third) of Suretyship and Guaranty §41 (Am. L. Inst. 1996).

[30] The lower court correctly held that Segal's suretyship defenses, including fraud and impairment of collateral, were waived by the language of the guaranty and CTA documents he signed, and granted summary judgment on those defenses against Segal.

24

matter jurisdiction,[31] plain error,[32] or an important constitutional question.[33] Furthermore, an appellate court may affirm a correct decision based on any grounds supported by the record, "regardless of the ground, reason or theory asserted by the lower court as the basis for its judgment." *Humphries v. Detch*, 227 W. Va. 627, 635 n.10, 712 S.E. 2d 795, 803 n. 10 (2011); Syl. Pt. 2, *Adkins v. Gatson*, 218 W. Va. 332, 624 S.E. 2d 769 (2005) (per curiam).

In the present case, Segal did not use the words "supervening frustration of purpose" or "discharge through alteration of principal's obligations" in the lower court, but he did cite a case stating the general principal that a surety (or guarantor) will be discharged "where a creditor does any act injurious to the surety, or inconsistent with his rights, or if he omits to do any act when required by the surety, which his duty imposes on him, and the omission proves injurious to the surety…." *Carr v. Sutton*, 70 W. Va. 417,___ , 74 S.

---

[31] *State ex rel. Hager v. Oakley*, 154 W.Va. 528, 177 S.E. 2d 585 (1970); s*ee Hudgins v. Crowder & Freeman*, Inc., 156 W.Va. 111, 118, 191 S.E. 2d 443, 446-47 (1972) (although jurisdictional issue was not raised in lower court, circuit court's ruling was set aside on appeal after case had already been submitted for decision upon briefs and oral argument).

[32] *Amanda C. v. Christopher P.*, ___ W. Va. ___, ___, 887 S.E.2d 255, 259-60 (Ct. App. 2022).

[33] Syl. Pt. 2, *Louk v. Cormier*, 218 W. Va. 81, 622 S.E. 2d 788 (2005); *see also Whitlow v. Bd. of Educ. of Kanawha Cnty.*, 190 W. Va. 223, 226-27, 438 S.E. 2d 15, 18-19 (1993).

E. 239, 241 (1912).[34] Segal contends that invoking *Carr* was sufficient to preserve the defenses of supervening frustration of purpose and discharge by alteration of the duties and obligations of the principal for appellate review because the law does not require parties to use "magic words." *See Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000) ("It is indeed the general rule that issues must be raised in lower courts in order to be preserved as potential grounds of decision in higher courts. But this principle does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue.").

Assuming, without deciding, that the issues of "supervening frustration of purpose" and "alteration of the principal's obligations" are properly before this court, we conclude that both defenses, even if otherwise viable, were expressly waived by the

---

[34] Segal cited *Carr* in his motion for summary judgment under the heading of "PITA equitably discharged Defendants' respective obligations under the Note when it absolved the obligations of the Trust and the Estate of Milan Puskar." He also cited *Carr* in the Joint Trial Memorandum where he identified the legal authorities he might rely on. In addition, Segal cited *Carr* and similar cases at page 2 of Defendants' Objections to Plaintiffs' Proposed Summary Judgment Order stating that:

> …West Virginia precedent has held for more than a century that when a creditor acts to the detriment of a surety, the surety is discharged, *Carr v. Sutton*, 70 W. Va. 417, 421, 74 S.E. 2d 239 (1912). That rule applies specifically in the situation presented here, in which a creditor releases some but not all guarantors. *Williams v. Carr,* 76 W. Va. 139, 85 S.E. 69, 70 (1915). Courts generally recognize, moreover, that a change to the obligation originally undertaken by a guarantor discharges the guaranty. *See, e.g.*, *United Foods, Inc. v. Burgess*, 488 F. Supp. 2d 384, 390-91 (S.D. N.Y. 2007).

language of the guaranty, which waives any defense other than full payment of the underlying debt. Moreover, the guaranty specifically waives any defense based on impairment of collateral, or a failure to seek satisfaction from collateral, which seems to be a main thrust of Segal's discharge arguments.[35] Similarly, we hold that any reliance on the general rules recognized in *Carr v. Sutton,* and *Williams v. Carr,* 76 W. Va. 139, 85 S.E. 69 (1915) (release of some guarantors releases others)*,* or the general rule that a change to the underlying obligation discharges the secondary obligor, were waived by the language of the guaranty.

Although guaranty defenses may be waived*, see Gregoire v. Lowndes Bank*, 176 W. Va. 296, 300, 342 S.E. 2d 264, 268 (1986) (per curiam) (waiver of impairment of collateral),[36] Segal argues that his guaranty defenses could not be waived in the 2009 guaranty agreement itself because the facts supporting such defenses had not yet arisen. It

---

[35] Segal has also argued that the purchase and assignment of the Protea loan with its guaranties was part of a scheme to make Segal responsible for all of the Protea loan, rather than his contributive share. Whatever the original intent may have been, PITA now seeks to recover only Segal's contributive share. Moreover, if PITA obtained a judgment against Segal for the entire amount of Protea's note, he would be able to seek contribution from the Trust even without paying the judgment. *See* W. Va. Code §45-1-6 (1923).

[36] "From early on, suretyship law allowed secondary obligors to waive suretyship defenses. This deference to freedom of contract is present in the law of virtually every jurisdiction and is explicitly incorporated into the revised text of Article 3 of the U.C.C. Indeed, waivers are so heavily utilized in some commercial contexts that it is rare to see a suretyship transaction in those contexts that does not contain a waiver of suretyship defenses." Neil B. Cohen, *Striking the Balance: The Evolving Nature of Suretyship Defenses*, *in* Symposium: The Restatement of Suretyship 34 Wm. & Mary L. Rev. 1025, 1042 (Summer 1993) (footnote omitted).

is widely recognized, however, that a guarantor or surety may agree in advance to a course of conduct on the part of the creditor which would otherwise result in discharge. *See Formulak v. Bank of Charles Town*, No. 15-0643, 2016 WL 2970311, at \*3 (W. Va. May 20, 2016)(memorandum decision)(guaranty language providing that liability would not be affected or impaired by any failure to give required notice); *Lestorti v. DeLeo*, 4 A.3d 269 (Conn. 2010); *Jones v. Dixie O'Brien Div., O'Brien Corp.*, 329 S.E. 2d 256 (Ga. Ct. App. 1985); *T.C.T. Bldg. Partnership v. Tandy Corp.*, 751 N.E. 2d 135 (Ill. Ct. App. 2001); *AS 2014-11 5W LLC v. Caplan Landlord, LLC*, 359 P.3d 1225 (Or. 2015); 38A C.J.S. *Guaranty* §90, Westlaw (database updated August 2023); Restatement (Third) of Suretyship & Guaranty §48, Comment (b) (Am. L. Inst. 1996) ("Consent may be given contemporaneously or in advance to a particular action or a class of actions or for all actions that would otherwise entitle the secondary obligor to discharge") and Comment (d) (waiver of suretyship defenses "may be accomplished in the contract creating the secondary obligation or otherwise.").

Thus, "[a] guarantor may validly waive rights and defenses in the guaranty contract." *Central Bldg., LLC v. Cooper*, 26 Cal. Rptr. 3d Ct. App212, 217 (Ct. App. 2005). *See* Restatement (Third) of Suretyship & Guaranty §6, Comment (a) (Am. L. Inst. 1996) ("Agreements between the secondary obligor and the obligee as to the availability and scope of suretyship defenses are typically incorporated into the contract creating the secondary obligation"); Peter Alces & Susan Sieger-Grimm, *The Law of Suretyship and Guaranty* §2.5 Westlaw (database updated June 2023)("The contract establishing the

suretyship may provide that the creditor's rights against the surety are not prejudiced by any actions of the creditor that impair the surety's recourse against the primary obligor.").

More specifically, guaranty language which waives the right to assert a defense based on impairment of collateral by the lender is enforceable. *See Federal Deposit Ins. Corp. v. Associated Nursery Systems, Inc.*, 948 F.2d 233, 240 (6th Cir. 1991); *Walker v. Probandt*, 902 N.W. 2d 468, 480 (Neb. Ct. App. 2017); *Interchange State Bank v. Rinaldi*, 303 N.J. Super. 239, 249-50, 696 A. 2d 744, 749-50 (1997); *Est. of Frantz v. Page*, 426 N.W. 2d 894, 898 (Minn. Ct. App. 1988); C.J.S. *Guaranty* §77 Westlaw (database updated August 2023) (and cases cited therein); Restatement (Third) of Surety and Guaranty §48 (Am. L. Inst. 1996); *cf. Cmty. Bank & Trust Co. v. Copses*, 953 F.2d 133, 135-37 (4th Cir. 1991) (holding that guarantor waived right to require creditor to use reasonable diligence to recover from pledged collateral before proceeding against guarantor). In fact, "[i]t is standard practice to include such a waiver of suretyship defenses in notes prepared by financial institutions or other commercial creditors." *Johnson v. Seville Holdings, LLC*, 2019 Il App. (5th) 180391-U, 2019 WL 3852664, at *4 (Ill. Ct. App. Aug. 15, 2019) (quoting comment to Illinois version of UCC regarding waivers of impairment of collateral defense). As noted in footnote 7, Segal signed a guaranty waiving any defense based on impairment of collateral.

Segal argues that releasing the security was not just an act injurious to himself but that it was also a material alteration of the underlying contract between Protea and the bank, and that such material alterations of the Protea note would be grounds for discharge of his guaranty. In addition to waiving any defense specifically based on impairment of collateral, Segal's guaranty waives any defense based on material alteration of the underlying contract between debtor and creditor, and such waivers contained in guaranties are enforceable. *See*, *e.g.*, *WRS, Inc. v. Plaza Ent., Inc*., 285 F. App'x. 872, 876-77 (3rd Cir. 2008); *U.S. v. Stump Home Specialties Mfg. Co., Inc*., 905 F.2d 1117, 1120 (7th Cir. 1990); *In Re Boco Enters., Inc*., 204 BR 407, 415 (Bankr. S.D. N.Y. 1997); *Steiner v, Handler*, 495 S.E. 2d 132, 134-35 (Ga. Ct. App. 1997); M.C.D., Annotation, *Construction and Application of Provision of Guaranty or Surety Contract Against Release or Discharge of Guarantor by Extension of Time or Alteration of Contract*, 117 A.L.R. 964 §1 (1938). As noted in footnote 6, Segal signed a guaranty waiving any defense based on modification of the principal's obligation.

Not only did Segal's guaranty contain waivers of surety defenses based on impairment of collateral and modification of the debtor's contract, but the original note signed by Protea allowed the bank to "release, substitute, or impair any Property securing the loan." Thus, releasing the collateral did not alter the underlying loan agreement which Segal guaranteed. *See Leonard v. Cnty. Ct. of Jackson Cnty.*, 25 W. Va. 45, 54-55 (1884). Alternatively, Segal can be deemed to have consented in advance to changes authorized by the underlying loan contract. *State ex rel. Mineral Cnty. Ct. v. Smith*, 92 W. Va. 12, ___,

114 S.E. 375, 377 (1922); Syl. Pt. 2, *State ex rel. Cnty, Ct. of Randolph Cnty. v. R. M. Hudson Paving & Const. Co.*, 91 W. Va. 387, 113 S.E. 251 (1922); James L. Elder, The Law of Suretyship §6.13 at 129 (5th Ed. 1951).

Segal has also argued that the release of the collateral resulted in a supervening frustration of purpose. Once again, the waivers of suretyship defenses contained in Segal's guaranty were sufficient to defeat this claim for discharge. A similar defense was considered and rejected in *Wallace v. Pinnacle Bank-Wyoming*, 275 P. 3d 1250 (Wyo. 2012), where two parents guaranteed a loan so that their son could purchase a car. When the son declared bankruptcy, the creditor released its lien on the car to the bankruptcy trust. The parents made payments for a time and were sued by the lender when they stopped. The parents asserted the defense of frustration of purpose arguing that it was a basic assumption of their guaranty agreement that the security would not be impaired or released. The court rejected this argument, noting that the guaranty agreement, like the guaranty in this case, stated that the collateral could be released, substituted or impaired without discharging the guarantors. Consequently, the existence of collateral could not have been a basic assumption or expectation of the guarantors when they signed the agreement. The court also noted that the purpose of the guaranty, to obtain a loan so that the son could obtain a car, had been achieved, rather than frustrated.

Similarly, in this case, where the promissory note and the guaranty provided that the lender could release or impair collateral, and the purpose of the guaranty (to obtain

a loan for Protea) was achieved, there was no frustration of purpose. Moreover, in this case, there was no collateral when the guaranty was signed in 2009, and no requirement or expectation that the lender would acquire any collateral, making it even more difficult to find that non-impairment of collateral was a basic assumption of the guaranty.

As Segal's banking expert admitted during his deposition, the guaranty signed by Segal was a standard industry form with commonly used waivers.[37] All of the guarantors who signed it were sophisticated parties capable of understanding its terms.[38] Our jurisprudence has long recognized that parties have a duty to read contracts before signing them. *See*, *e.g.*, Syl. Pt. 4, *American States Ins. Co. v. Surbaugh*, 231 W.Va. 288, 745 S.E. 2d 179 (2013); *Lewis v. State Automobile Mut. Ins. Co*., 115 W.Va. 405, 177 S.E. 449, 451 (1934). Although Segal asserted that he did not have an adequate opportunity to read this two-page document before he signed it in 2009, the provisions of his guaranty, including the waiver of various defenses, were reaffirmed in the CTA he signed in 2017, and there is no allegation that he did not have ample opportunity to examine this later

---

[37] The guaranty signed by Segal in 2009 was a standard form prepared by Bankers Systems, Inc. of St. Cloud, Minnesota. Similarly, the CTA signed by Segal in 2017, which reaffirmed his obligations under the 2009 guaranty, was a standard form prepared by Compliance Systems, Inc. Accepting Segal's argument that no suretyship defense could be waived in advance, even though it is commonly done with lending documents and guaranties, would completely upend the law and practice of commercial lending as it currently exists.

[38] Hostler and Segal were both experienced attorneys when they signed the guaranty. Harris was a systems engineer, and the founder and CEO of a computer consulting company. All three guarantors were also directors and shareholders in Protea.

32

document before signing it. Furthermore, the Additional Provisions section of the CTA declares that: "By signing this Agreement, each Borrower and Guarantor and Hypothecator acknowledges reading, understanding, and agreeing to all its provisions, and receiving a copy." We are not at liberty to rewrite the clear terms of the Guaranty and CTA documents signed by Segal.[39]

## F. Contributive Shares: Holding Trust and Segal Equally Liable for Unpaid Balance

The Trust gave a guaranty for $3 million, while Segal, Harris, and Hostler gave guaranties of $1 million each, although not all guaranties were given concurrently.[40] The Trust argues that as one of two remaining guarantors, Segal should be liable for half of the remaining balance of the Protea loan, while Segal maintains that if he has any liability under his guaranty, that his share should be limited to 1/6 of the remaining balance, because that was his share of $6 million worth of guaranties ($3 million by the Trust and $1 million each by Segal, Harris, and Hostler). Both parties cite to the Restatement (Third)

---

[39] We note in this regard that: "This State's public policy favors freedom of contract which is the precept that a contract shall be enforced except when it violates a principle of even greater importance to the general public." Syl. Pt. 3, *Wellington Power Corp. v. CAN. Sur. Corp*, 217 W. Va. 33, 614 S.E. 2d 680 (2005). Freedom of contract is subject, of course, to general doctrines of contract law such as good faith and unconscionability that protect against overreaching and abuse, but subject to such limitations, sophisticated parties dealing at arm's length in complicated financial transactions should be free to structure their relationships to suit their needs.

[40] None of the parties have argued that the Puskar estate, long since closed in 2015, should be included in the analysis of contributive shares. As noted above, Puskar was one of the four original guarantors with a guaranty of $1 million.

of Suretyship and Guaranty §57 (Am. L. Inst.1996), while Segal also relies on *State ex rel. Connellsville By-Product Coal Co. v. Continental Coal Co.*, 117 W. Va. 447, 186 S.E. 119 (1936), *overruled on other grounds*, *State ex rel. Shenandoah Nat'l Bank v. Hiett*, 123 W. Va. 739, 17 S.E. 2d 878 (1941). The difficulty in this case arises from the fact that the Segal and Trust guaranties were for different amounts and were not all made at the same time. There is no dispute that if their limits of liability had been equal, then their contributive shares would also have been equal.

As a general rule, co-guarantors are responsible for equal shares of the unpaid balance on the underlying debt, but this rule is not without exceptions. As the Supreme Court of Appeals of West Virginia observed in Syllabus Point 3 of *Est. of Bayliss by Bowles v. Lee*, 173 W. Va. 299, 315 S.E. 2d 406 (1984): "The rule of equal or *pro tanto* contribution is not absolute if it can be shown that the co-obligors have by agreement made a different allocation as to their liability *inter se* or one or more of the co-obligors have received a disproportionate benefit from the transaction, then disproportionate contribution may be allowed." *Accord Rahall v. Tweel*, 186 W.Va. 139, 411 S.E. 2d 461, 464 (1991). Co-obligors may define their rights to contribution among themselves by express or implied agreement. S*ee Lowe v. Albertazzie*, 205 W.Va. 47, 53-54, 516 S.E. 2d 258, 264-65 (1999); s*ee also* Laurence P. Simpson, Handbook on the Law of Suretyship at 238 (1950) ("The right of contribution… can be controlled by contract in any way the sureties see fit.").

In some cases, a departure from the usual rule of equal shares may be justified by certain equitable considerations, such as when the parties receive disproportionate benefits. *See Beverly v. Thompson*, 229 W.Va. 684, 735 S.E. 2d 559 (2012) (per curiam). In cases where contribution is determined on the basis of equitable circumstances, rather than the existence of an express or implied agreement, the court has some discretion as to what is a fair and reasonable allocation. *See id.* at 689, 735 S.E. 2d at 564.[41]

The Third Restatement of Suretyship and Guaranty takes a similar approach, presuming that "the contributive share of each cosurety is presumed to be the total liability of the cosureties to the obligee divided by the number of cosureties," unless the parties have agreed to a different allocation. Restatement (Third) of Surety and Guaranty §57 comment a (1996); s*ee also* Peter Alces & Susan Sieger-Grimm, *The Law of Suretyship and Guaranty* §5:5 Westlaw (database updated June 2023)("The presumption [under the Restatement] is that cosureties are liable to the obligee in proportion to the number of cosureties, that is, two cosureties are each liable for half, three sureties are liable for one third, and so on.")(footnote omitted).

---

[41] In *Beverly v. Thompson*, 229 W. Va. 684, 735 S.E.2d 559 (2012) (per curiam), contributive shares were allocated based on the percentage of stock ownership of the co-guarantors, with a married couple owning one half of the stock between the two of them, and another individual owning the other half. Although there were three guarantors, the trial court held that the third guarantor owning one half of the stock was responsible for a contributive share of one half the secured debt. This ruling was affirmed on appeal because the decision to set the contributive share at one half, rather than one third, was protected by "the parameters of sound discretion." *Id*. at 689, 735 S.E. 2d at 564.

Section 57(1) of the Restatement addresses the issue of express and implied agreements to vary the usual rule concerning equality of contributive shares. It provides that "[s]ubject to subsection (2) and to any express or implied agreement between or among the cosureties, a cosurety's contributive share is the aggregate liability of the cosureties to the obligee divided by the number of cosureties." Comment a to this section explains the general principle:

> With respect to the obligee, each cosurety is liable to the full extent of its secondary obligation. When an obligee obtains recovery from one of the cosureties, however, the cost of that performance should not ultimately rest completely on that cosurety. Rather, the cosureties are treated as though they agreed among themselves to share the cost of their performance. Thus §55(2) gives the performing cosurety recourse against the nonperforming cosureties in order to bring about a sharing of that cost. The share of that cost to be borne by each cosurety is that cosurety's contributive share. Under subsection (1), the contributive share of each cosurety is presumed to be the total liability of the cosureties to the obligee divided by the number of cosureties.

Comment b to Section 57 recognizes that the general rule of equality may be altered by the parties through express agreements among themselves.

> If the cosureties agree to determine their contributive shares by a different formula than that set out in subsection (1), their agreement controls. Sometimes, such an agreement is expressed in terms of the proportion of the total liability that each cosurety agrees to bear. Other times, it may be expressed in terms of the amount for which each cosurety will be responsible in the event of the principal obligor's complete default. In the latter case, if the principal obligor performs in part, the contributive share of each cosurety is the same proportion of the remaining liability as was the amount agreed upon of the total liability.

36

Illustration 3 demonstrates how contributive shares are allocated when the co-sureties have agreed among themselves that they will be liable for different amounts of the principal's obligation:

> …$S_1$, $S_2$, and $S_3$ agree among themselves that, of the $3,000 for which they are potentially liable, $S_1$ will be responsible for $1,500, $S_2$ will be responsible for $900, and $S_3$ will be responsible for $600. D defaults, owing C $2,500. $S_1$'s contributive share is $1,250; $S_2$'s contributive share is $750; $S_3$'s contributive share is $500. Those contributive shares represent the same proportion of the $2,500 liability as the proportion the amounts agreed were of the total potential liability.

In the case at bar, there was never an express agreement among the parties as to how to allocate their contributive shares (which became important when the Trust executed a guaranty for a different amount than the other guarantors). In fact, there is no evidence in the record that Hostler, Harris and Segal were even aware of the Trust's guaranty until *after* it was executed. The absence of an express agreement raises the question of whether there might have been an implied agreement.

> Comment C discusses implied agreements under Section 57, stating that:

> In many cases where there is no express agreement between cosureties, an agreement as to contributive shares can be implied by the circumstances. The circumstances justifying such a finding may relate either to the general relationship among the cosureties or to the circumstances surrounding the particular suretyship transaction.

Illustration 5 explains how an implied agreement as to how to allocate contributive shares might arise without an express agreement when the co-sureties obligated themselves for different amount of the principal's debt:

> To induce C to lend D $3,000, S1, S2, and S3 each agree to be secondary obligors with respect to D's obligation. Pursuant to S1's secondary obligation, S1's maximum liability to C is $1,500; pursuant to S2's secondary obligation, S2's maximum liability to C is $900; pursuant to S3's secondary obligation, S3's maximum liability to C is $600. S1, S2, and S3 enter into no express agreement among themselves as to their contributive shares. D defaults, owing $100 to C. **The fact finder may find an implied agreement from these circumstances that the cosureties' contributive shares are to be in proportion to their maximum individual liabilities**, so that S1's contributive share is $50, S2's contributive share is $30, and S3 's contributive share is $20.

(Emphasis added). In support of his position, Segal cites this illustration, apparently arguing that the court should find an implied agreement in this case based on the ratios of the amounts which the co-sureties committed themselves to.

The Reporter's Note provides additional discussion of implied agreements allocating contributive shares, stating in part that:

> *Comment c.* Subsection (2) and this Comment simplify the rule stated in Restatement of Security § 154, Comment *f.* That rule, based on Restatement of Restitution § 85, was used to determine the contributive shares of cosureties when their secondary obligations limited their liability to different amounts. Under that rule, the contributive shares of cosureties are determined by calculating the fraction that each cosurety's maximum liability represents of the total maximum liabilities of all cosureties. This rule is continued in Illustration 5 to this section. *See generally Schoenfeld v. Neher*, 453 F.2d 896 (10th

38

Cir.1972); *State ex rel. Connellsville By-Product Coal Co. v. Continental Coal Co.*, 117 W.Va. 447, 186 S.E. 119 (W.Va.1936); A. Stearns, The Law of Suretyship § 11.19, at 482-83 (J. Elder rev., 5th ed. 1951).

Although the Third Restatement refers to both the Restatement of Restitution §85 (Am. L. Inst. 1937)[42] and the Restatement of Security §154, Comment f (Am. L. Inst.

---

[42] Restatement (First) of Restitution §85 comment f (Am. L. Inst. 1937) provides in pertinent part that:

> *f. Proportionate share—unequal shares with individual obligations.* Where persons are engaged in a common enterprise, their liability to contribution to each other is unequal if their interests in the enterprise are unequal or if they so agree. Likewise, persons secondarily liable may share the duty of contribution unequally, as where one or more of them limit liability to specified portions of the obligation or to specified amounts. In all such cases their liability to contribution is dependent upon the apportionment between them. … Thus if two persons are securities upon a debt, one limiting his liability to $10,000 and the other to $5000, and the first pays $7500, which is the total amount of the debt due, he is entitled only to $2500 as reimbursement from the other. If there are three sureties, one with liability limited to $10,000, one to $5000 and the other with unlimited liability and if the amount finally due from the principal obligor is $7500, the first should pay $3000, the second $1500, and the third $3000.

1941),[43] it modifies the rule of those earlier restatements, in order to "simplify" the rule.[44]

In the words of the Reporter for the Third Restatement:

---

[43] Restatement (First) of Security 154, comment f (Am. L. Inst. 1941) states in pertinent part:

> *f. Contribution as affected by unequal surety obligations.* Sureties may be bound to answer generally for the default of the principal, or their obligations may be restricted to specific amounts which may differ among themselves. In the absence of an agreement among them as to the distribution of their liabilities, or where their stipulated liabilities are for the same amount, one who pays the entire amount is entitled to recover from each of the others a sum equal to such amount divided by the number of persons participating. Thus, if there are three cosureties and one pays the entire debt, he is entitled to a contribution of one-third from each of the others. (See Restatement of Restitution, § 85, Comment *c*.) Where the risks assumed are unequal, the proportionate share is determined by the amount of risk assumed by each. Thus, if two persons are sureties upon a debt and one limits his liability to $10,000 and the other to $5000, the former should bear two-thirds of the ultimate liability. If this is $7500 and it is paid by the first, he can recover $2500 from the second.

[44] The earlier approach of automatically assigning proportionate shares based on the ratio of liability limits in guaranties or suretyship agreements created some unintended and/or undesirable results. For example, Comment C to Section 57 of the Third Restatement discusses the situation where some, but not all, of the co-obligors limited their liability:

> When that rule was applied to situations in which some, but not all, of the cosureties had limited their liability, however, the rule produced counterintuitive results. Under that rule, a cosurety who had not limited its liability was presumed to have agreed to liability equal to the total liability to the obligee. Thus, for example, in a situation in which $S_1$ signed a guaranty containing no limit on liability, $S_2$ signed a guaranty providing for a maximum liability of $5,000, and $S_3$ signed a guaranty providing for a maximum liability of $10,000, the

40

…under that rule, even though the cosureties had not agreed among themselves that any of them would have a contributive share other than the equal proportionate liability presumed by subsection (1), and such equal liability would not exceed the maximum liability agreed to by any of them, that rule would provide for quite different contributive shares. Under this Restatement, however, such a counterintuitive result would not be mandated. Rather, the question is whether the circumstances, including the different maximum liabilities of the cosureties, justifies an inference of agreement as to differing contributive shares. Of course, under subsection (2)(a), no cosurety will be liable beyond its maximum.

---

cosureties had no express agreement among themselves as to contributive shares, and the total liability to the obligee turned out to be \$15,000, that rule treated $S_1$ as having agreed to a maximum liability of \$15,000. As a result, under that rule, the total maximum liability of the three cosureties would be deemed to be \$30,000 (the sum of $S_1$'s deemed maximum of \$15,000, $S_2$'s actual maximum of \$5,000, and $S_3$'s actual maximum of \$10,000); accordingly, the contributive share of $S_1$ would be \$7,500 (because $S_1$'s deemed maximum of \$15,000 represented half the total of \$30,000), the contributive share of $S_2$ would be \$2,500, and that of $S_3$ would be \$5,000. Thus, under that rule, even though the cosureties had not agreed among themselves that any of them would have a contributive share other than the equal proportionate liability presumed by subsection (1), and such equal liability would not exceed the maximum liability agreed to by any of them, that rule would provide for quite different contributive shares.

*Tucker v. Gant*, 185 P.2d 205 (Okla. 1947) presents another situation where rigid application of the rule would lead to an undesirable result. In *Tucker*, there were five sureties on an indemnity contract for \$5000, one of whom wrote "\$1,000 limit" after his name. The court rejected his argument that his contributive share was limited to a 1/21 share, declaring that: "The fallacy in defendant's argument is that the obligee herein could, if the loss was sufficient, collect \$5,000 from A, or B, or C or D, the other obligors, rather than \$5,000 from A and B and C and D. If we follow his reasoning in a case where the loss was \$5,000, the entire amount of the contract, then he would be liable for one twenty-first thereof or \$238.09 and his liability limit could never be reached. *Id*. at 206.

Thus, the Third Restatement of Suretyship and Guaranty takes a different approach than the earlier restatements pertaining to Restitution and Security. In the Third Restatement of Suretyship and Guaranty, the Reporter indicates that the existence of an implied agreement to allocate contributive shares based on the ratio of amounts which the co-sureties have committed themselves to is a question for the finder of fact involving *all* of the circumstances, not just the amounts of the obligations. Segal appears not to recognize this difference between the Third Restatement of Suretyship and Guaranty and the earlier restatements in his briefing or oral argument, seemingly taking the position that an implied agreement to allocate contributive shares must be found in this case as a matter of law without regard to any factors other than the amounts of the commitments. We do not agree with this reading of the Third Restatement. Furthermore, we do not believe that there was sufficient evidence of an implied agreement to raise a factual issue as to whether one existed. Similarly, we do not believe that the lower court abused its discretion in failing to find an equitable exception to the general rule of equality among co-obligors.

In addition to Illustration 5 of the Third Restatement of Suretyship and Guaranty, Segal relies on *State ex rel. Connellsville By-Product Coal Co. v. Continental Coal Co.*, 11 W.Va. 447, 186 S.E. 119 (1936). *Connellsville* turned on a procedural question, whether claims on different bonds securing the same debt could be brought in the same lawsuit. The first bond was for $12,500 while the second bond was for $7,500. The court held that these claims could be joined in the same litigation and declared that the

sureties would be bound in proportion to the amount of their respective bonds. As the court

explained:

> The differences in the bonds do not make the actions different. The bonds relate to the same matter, have the same condition, and are cumulative. Every surety is equally liable pro tanto for a default of that condition. They are all regarded as cosureties and as if bound by one instrument, in proportion, however, to the penalties of their respective bonds. This doctrine, first pronounced by Lord Chief Baron Eyre in 1787 in *Dering v. Winchelsea*, 1 Cox 318, has found ready acceptance in the states. He said: "What difference will it make if they (sureties) are severally bound, and by different instruments, but for the same principal, and the same engagement? In all these cases the sureties have a common interest and a common burthen: they are joined by the common end and purpose of their several obligations as much as if they were joined in one instrument, with this difference only, that the penalties will ascertain the proportion in which they are to contribute."

*Id.* at ___, 186 S.E. at 121. *Connellsville* was subsequently overruled on the procedural

issue of whether claims against separate bonds could be joined in a single action.[45] Because

*Connellsville* turned on a procedural joinder question, its statement concerning how to

allocate contributive shares was merely dicta, and therefore not binding on this Court. The

*Connellsville* decision has never been cited by our high court for its statement concerning

apportionment of contributive shares in the eighty-seven years since it was published.

Although not cited by the parties, *Connellsville* is not the only West Virginia

case discussing, albeit in dicta, proportional contributive shares among cosureties based on

---

[45] *Connellsville* was decided before West Virginia adopted modern rules of civil procedure allowing liberal joinder of claims and parties. *See, e.g.,* W. Va. R. Civ. P. 20.

43

the amount of their commitments. In Syl. Pt. 2 of *Central Banking & Sec. Co. v. United States Fid. & Guar. Co.*, 73 W.Va. 197, 80 S.E. 121 (1913) (emphasis added), the court stated:

> Bonds, given by a personal representative before the clerk of a county court in the vacation of the court as new bonds, after he had previously qualified and given bond, are not substitutes for the original bond, but are valid and enforceable as additional ones and as further security; and, **in case of necessity for contribution among the sureties, the proportion of contribution is determinable by the penalties of the several bonds.**

In the body of its opinion, the *Central Banking* court discusses the issue further:

> Being valid obligations and yet not substitute bonds, and having been given for the same principal as the one for whom the first bond was given, and to guarantee faithful execution of the same trust, the two subsequent bonds are mere cumulative or additional bonds, and the sureties therein are cosureties with the surety in the first one. Brandt, Suretyship & Guar. § 707. "Successive bonds given by guardian are cumulative securities for the faithful performance of the duties of the office, and the liabilities of the sureties are in proportion to the penalties of the several bonds in which the respective sureties bound themselves." *Jones v. Hayes*, 38 N. C. 502, 44 Am. Dec. 78.

*Id*. at ___, 80 S.E. at 123.

In the Restatement (First) of Restitution 85, in the decisions listed in support of comments f and g, (1937), *Central Banking* is cited as a case supporting the principle of contributive shares based on the proportional amounts of the liability limits of the cosureties. Like *Connellsville*, the *Central Banking* opinion turned on a procedural question

44

(the res judicata effect of a judgment regarding one bond in subsequent litigation involving other bonds securing the same debt), rather than the substantive rule governing contributive shares among cosureties. Moreover, in *Central Banking*, all the bonds were for the same amount. Thus, the court's language pertaining to the proportional allocation of contributive shares based on limits of liability was again dicta. *Central Banking* has not been cited by our high court concerning the determination of contributive shares in the almost one hundred ten years since it was decided.

Both *Connellsville* and *Central Banking* hearken back to the seminal English case of *Dering v. Winchelsea*, 1 Cox 318 (1787), which also involved equal, rather than differing, bonds. Another old case from our state, *Hawker v. Moore*, 40 W. Va. 49, 20 S.E. 848 (1894), also cites the venerable case of *Dering,* but stresses that contribution is an equitable doctrine, and that "equality is equity," in concluding that one of two co-sureties should be able to compel the other co-surety to pay an equal half share of a judgment.

In *Hawker*, the Merchants' National Bank of West Virginia was the holder of a promissory note given to the bank by the principal, James Hawker, with Owen Hawker and Wilson Moore as sureties. The bank obtained a judgment against all three obligors, but since the principal, James Hawker, was insolvent, it obtained a satisfaction of the judgment from his surety, Owen Hawker. The court held that Owen Hawker could sue Wilson Moore for contribution, stating in is first syllabus point that: "Between cosureties there should be proportionate equality of burden. One who has been compelled to pay the whole, the

45

principal being insolvent, has a right in equity to compel his cosurety to pay his equitably

equal part." In its opinion, the court noted that the ability to sue co-obligors for their share

"is the creature of equity, and real essential justice is its object." *Id*. at 849, 20 S.E. at ___.

The Court also said:

> The doctrine is eminently calculated to do exact justice
> between persons who are bound for the performance of the
> same duty or obligation, and is one, therefore, which is much
> encouraged and protected. "Equality is equity" is on this
> branch its maxim. It springs naturally out of the two equities of
> contribution and exoneration, and is in fact one of the means
> by which those equities are enforced.

*Id.* (citations omitted). *Dering v. Chelsea* was one of the cases cited by the *Hawker* court

in support of this position, and it went on to say:

> Here the plaintiff has paid off the judgment, and asks the court
> to give him the benefit of the creditor's lien. Who can object to
> this? …
> Not the cosurety, for it is by his fault that plaintiff had to bear,
> in the first instance, the whole burden. If he had paid his half,
> and equality is equity, there would have been no occasion to
> ask the court to compel him to pay; and it does not lie with him
> to say that plaintiff shall not occupy a vantage ground that
> enables him, by process of law, to enforce the performance of
> this duty.

*Id.* The *Hawker* opinion does not indicate whether the sureties at issue were contained in

separate documents or whether they might have been for different amounts, but its

emphasis on equality is worth noting.

We recognize that, absent express language reflecting an agreement or the parties' clear intent, it may be difficult to determine the actual intent of co-guarantors and their expectations as to how to allocate their contributive shares. This certainly includes the situation where co-obligors guarantee different amounts of the same underlying obligation. We cannot assume that just because the guaranties had different limits of liability that the parties intended to allocate contributive shares proportionally based on the amounts of their liability limits. There could be any number of reasons why co-guarantors or co-sureties might have placed different limits on their respective guaranties. The analysis is further complicated where, as in this case, the co-guarantors do not execute the guaranties at the same time or as part of the same transaction, and do not explain their intent, motivation, or expectations in the guaranties or in a separate agreement governing their contribution rights among themselves.

For that reason, the most prudent and logical approach for this Court, particularly in commercial and investment transactions like the one here, where there is no express or implied agreement among the co-obligors, is to adopt a general rule as to contributive shares, with some limited exceptions based on a preponderance of evidence. Specifically, co-obligors will have equal contributive shares unless there is an express or implied agreement to the contrary. In determining whether equitable exceptions exist to the general rule, courts should consider all the relevant circumstances, not just the existence of guaranties with different limits on liability. *See Tucker v. Gant*, 185 P. 2d 205 (Okla. 1947) (holding that the insertion of the words "$1,000 liability limit" after the surety's name on

a bond had been made for the purpose of limiting liability to the obligee and not for the purpose of showing an agreement between himself and his co-sureties as to their contributive shares; this decision turned in part on the fact that the other sureties were unaware of the surety for $1,000); *Rose v. Wollenberg*, 59 P. 190 (Or. 1899)(holding that there was insufficient proof of an implied contract to vary the rule of equal contribution between sureties even though one surety had guaranteed $10,000 of a $30,000 bond while the other surety had guaranteed $20,000 of the same bond).

Analysis should focus on the timing of guaranties, the amount of liability, the motivations of the guarantors or sureties, and a comparison of any direct or indirect benefit received by each obligor for providing their guaranty. Courts must consider whether there is sufficient evidence to identify the intent and expectations of the parties and/or to determine whether differences in benefits received justify an alternative contributive share. This is essentially what Section 57 of the Restatement (Third) of Suretyship and Guaranty (Am. L. Inst. 1996) does, and we adopt that approach and apply it here.[46] In so doing, we

---

[46] We note that our Supreme Court of Appeals has often looked to the restatements for guidance, especially in the areas of guaranty and suretyship. *See Lowe v. Albertazzie*, 205 W. Va. 47, 516 S.E. 2d 258 (1999) (recognizing the principle of subsurety contained in Restatement (Third) of Suretyship and Guaranty §53 (1996)); Syl. Pt. 3, *Logan Bank & Trust Co. v. Lettershop, Inc.*, 190 W.Va. 107, 437 S. E. 2d 271 (1993) (adopting §124 of the Restatement of the Law of Security (1941) concerning when a creditor has a duty to disclose certain facts concerning a debtor to a surety); *In Re Petition of Perito II*, 246 W. Va. 439, 450, 874 S.E.2d 241, 252 (2022) (Wooton, J., dissenting) ("even a cursory review of our precedents reveals that we have often looked to the restatements and accepted them as persuasive authority."); *Gateway Commc'ns, Inc. v. Hess*, 208 W. Va. 505,512, 541 S.E. 2d 595, 602 (2001)(Starcher, J., dissenting)(citing with approval Restatement (Third) of

recognize that other jurisdictions continue to follow the old rule, advocated by Segal, that contributive shares are mechanically calculated by reference to the ratio of liability limits in guaranties. However, we believe that the rule adopted today is better suited to meet the needs of modern commercial transactions, is supported by the Third Restatement, and is consistent with more recent West Virginia decisions in *Est. of Bayliss v. Lee*, 173 W. Va. 299, 315 S.E. 2d 406 (1984) and *Beverly v. Thompson*, 299 W. Va. 684, 735 S.E. 2d 559 (2012) (per curiam).

Our rule also recognizes the distinction between guaranties and agreements among co-obligors to allocate their contributive shares among themselves. The relationship of guarantor to obligee is different from the relationship between co-obligors, both in substance and effect. Absent some express language in the guaranty clearly and specifically providing a method for apportioning contributive shares among co-obligors, it is not an agreement among them. It is an agreement between the guarantor and the obligee. Accordingly, it does not make sense to automatically assume that differing amounts in guaranties indicate an agreement among co-obligors to define contributive shares among themselves, either express or implied, or to assume it is a reflection of their expectations

---

Suretyship and Guaranty §66 (1995)); Charles D. Dunbar, *West Virginia State Law of Guaranties* in The Law of Guaranties: A Jurisdiction-by-Jurisdiction Guide to U.S. and Canadian Law 1147 (Jeremy S. Friedberg, Brian D. Hulse & James H. Prior eds., 2013)("…West Virginia courts often look to the *Restatements*, including the *Restatement of Suretyship and Guaranty*, for guidance in filling gaps in authority.").

or intent as to the appropriate method of allocation when one of them has paid more than his fair share of a joint liability.

This logic is particularly compelling when, as here, the parties have signed separate instruments at different times, and without knowledge of all the other guaranties. The original four guaranties, although separate instruments, were entered into at about the same time[47], apparently with all of the obligors being aware of the other guaranties. That knowledge may well have influenced their decisions to guarantee the Protea debt and shaped their expectations in the event of a default. The fact that the four original guaranties were each for the same amount, $1 million plus interest and assorted costs, may arguably suggest an expectation that all were equally bound with an equal contributive share.

Obviously, the situation changed when the Trust unilaterally provided another guaranty for $3 million approximately a year later, thereby creating the issue in this case. This additional guaranty was not requested by the other guarantors and was not part of a joint agreement to define their contributive shares among themselves. Based on the record on appeal, the original guarantors did not request or bargain for the additional guarantee and in fact were not even aware of it until sometime after the fact. Under this timing and circumstances, it is not reasonable to conclude that the subsequent act had any impact on the four individual (as opposed to corporate) coguarantors' original expectations,

---

[47] Harris, Hostler, and Puskar signed their guaranties on August 27, 2009. Segal signed his guarantee a month later, on September 28, 2009.

nor really any basis to conclude that their expectations changed after the new guaranty. Although one might speculate, there is no documentary, firsthand evidence of the purpose or reason for, or intent of the subsequent additional guarantor. To the extent the Trust intended to release or substitute for all or any of the existing guarantors, or to eliminate or reduce their liability, there is no document reflecting such intention. Clearly, the Trust, as well as the coguarantors, had plenty of time, and multiple opportunities, to document such intent, or to request a clarification of their relationship when or after the additional guaranty was executed. Significantly, there is absolutely no evidence in the record that they did so.

It is not appropriate to speculate and simply assume the existence of some implied agreement establishing a basis to determine contributive share when guarantees were not entered into concurrently and as part of same transaction. Where the guaranties are for differing amounts or with different limits, we cannot simply speculate or assume a particular purpose or intent for doing so beyond an intent to limit their liability to the obligee.

Having determined what rule governs the allocation of contributive shares, we now focus on and further review the facts of this case considering that rule. We begin our analysis by stating the appropriate burden of proof.

> Absent proof to the contrary, it is presumed that co-obligors received equal benefit from the obligation and they must contribute equally to its payment. ... If there be any contrary agreement or other equitable reason for an unequal

51

apportionment, the burden of alleging and proving such facts
is on the proponent of such facts.

*Betz v. Fagan*, 962 S.W.2d 432, 436 (Mo. Ct. App. 1998) (citations omitted). *Accord Tucker v. Gant*, Syl. Pt. 3, 185 P.2d 205 (Okla. 1947); 18 Am. Jur. 2d Contribution §99 Westlaw (database updated May 2023); Arthur R. Stearns, The Law of Surety §11.21at 487 (5th ed. 1951).

Our West Virginia cases are consistent with this assignment of the burden of proof in cases involving alleged co-obligors. S*ee McKown v. Silver*, Syl. Pt. 2, 99 W.Va. 78, 128 S.E. 134 (1925):

> Where one of several joint endorsers, contrary to the legal effect of his endorsement, asserts that his contract with his co–endorsers was that he was to be bound differently from the legal import of his endorsement, the burden is upon him to establish such fact by a preponderance of the evidence, without which he should not prevail.

*Accord Rahall v. Tweel*, Syl. Pt. 7, 186 W. Va. 136, 411 S.E. 2d 461 (1991) (party asserting that he is an accommodation party, rather than a co-endorser of a promissory note, has the burden of proof); s*ee generally Huffman v. Manley*, 83 W. Va. 503, 98 S.E. 613 (1919). Thus, the party asserting that contributive shares should not be equal has the burden of proving by a preponderance of the evidence that a different allocation is required by an express or implied agreement, or by equitable circumstances.

In this case, PITA and the Trust point to the fact that both Harris and Hostler indicated in their financial statements submitted to United both before and after the additional guaranty of $3 million that they had a guaranty obligation of $750,000 in connection with the Protea loan. At the time at least some of these statements were submitted, there were effectively four guarantors (Harris, Hostler, Segal and the Trust) because Puskar had died and his estate was subsequently closed.[48] Thus, these statements arguably provide some evidence that these guarantors believed that each of them was responsible for an equal, one fourth contributive share of the Protea loan, notwithstanding the fact that the Trust had guaranteed $3 million, while each of the individuals had guaranteed only $1 million.[49]

---

[48] Puskar's estate was closed in 2015. Harris and Hostler filed financial statements recognizing a guaranty obligation of $750,000 from at least 2013 through 2017.

[49] Counsel for PITA has also represented in pleadings, argument, and briefing that on multiple other occasions Harris, Hostler, and Segal acknowledged guaranty obligations of $750,000 even after the $3 million Trust guaranty, including in Protea Bankruptcy filings, in PITA and the Trust's joint complaint, and in separate litigation initiated by Segal in Federal Court. The purpose of these various representations was apparently as additional support for PITA's position that Segal was aware of, and acknowledged, an equal contributive share of $750,000. However, the record on appeal does not support such representations which appear to be argumentative at best. Accordingly, these representations are not the type of undisputed facts that should be relied upon in granting a motion for summary judgment. While it is unclear to what extent the lower court accepted or relied on these representations, this Court does not consider these representations to be completely accurate nor undisputed and accordingly does not rely on them in its evaluation or its ultimate decision and Opinion.

We also find it relevant that the original four guaranties by Puskar, Harris, Hostler, and Segal were all for the same amount, $1 million each, at least arguably evincing an intent to be equally responsible for the Protea loan. The guarantors did not contract among themselves for a different share arrangement when the Trust subsequently pledged its guarantee of $3 million, when stock and money market certificates were pledged, nor when the CTA was executed. This case was pending for almost four years in the lower court, during which time there was extensive discovery and motion practice, culminating in the order now on appeal. Despite this extensive litigation, there simply is insufficient evidence to raise a material fact regarding an implied agreement or any possible equitable exception to the general rule that co-obligors are subject to equal contributive shares absent an agreement to the contrary among them.

In the present case, we see no reason to depart from the general rule that co-guarantors are equally liable for the balance of an underlying obligation, up to the amount of their individual guaranties.[50] Thus, Segal would be responsible for one half of the unpaid balance, up to the limit of his guaranty. Although co-guarantors may agree among

---

[50] As noted above, *Connellsville By-Product Coal Co*. does not compel a different result. The issue decided in that case concerned whether claims against two different bondsmen could be joined in one action, not the respective contributive shares of the two bondsmen. To the extent that the court discussed the liability of the two bondsmen, it is not clear that it described an unequal liability for them. In its opinion, the *Connellsville* court stated that: "The differences in the bonds do not make the actions different. The bonds relate to the same matter, have the same condition, and are cumulative. **Every surety is equally liable pro tanto for a default of that condition.** They are all regarded as cosureties and as if bound by one instrument, in proportion, however, to the penalties of their respective bonds." 117 W. Va. at ___, 186 S.E. at 121 (emphasis added).

themselves as to their respective shares,[51] and provide for something other than equal shares, we find no such agreement, either express or implied, in this case. Nor do we find equitable circumstances which justify departing from the general rule. Consequently, we affirm the ruling of the lower court that Segal and the Trust were equally liable for the unpaid balance of the Protea loan. Co-obligors who wish to avoid the "default" position of equal contributive shares embraced by this opinion are free to make other arrangements among themselves either in their guaranties or in separate contracts among themselves.

## G. Segal Counterclaim Against Trust for Breach of Contract

Segal contends that Puskar, acting through and on behalf of the Trust, intended to protect him and the other guarantors in the event that Protea defaulted on its loan, and made that representation to Segal, the other guarantors, and the Bank. According to Segal, this is why the Trust signed a guaranty for the full amount of the loan to Protea and later (after Puskar's death) pledged half a million shares of Mylan Laboratories, Inc. stock as collateral. Puskar may have wanted to protect his friends in the event that Protea defaulted on its loan, but there is no evidence that he or the Trust provided an additional guaranty of $3 million, pledged stock as collateral, or did anything else in return for any promises on their part. In fact, it appears that the guarantors were not even allegedly told

---

[51] Of course, while co-obligors may reach an agreement among themselves "which limits their liability on contribution to each other, such an agreement cannot ordinarily be used to alter their obligation to the principal creditor." *Est. of Bayliss v. Lee*, 173 W. Va. 299, 304 n. 5, 315 S.E. 2d 406, 411 n. 5 (1984).

that Puskar intended to take care of them until after the Trust had already executed a guaranty for the full amount of the loan. Nor is there any evidence in the record that the guarantors ever asked Puskar or the Trust to execute a guaranty for the full amount of the Protea loan, provide collateral to secure the loan, or to waive any future claims for contribution that might arise.

In fact, United's corporate representative testified during deposition that it was Centra (United's predecessor) which requested a guaranty from the Trust.[52] He also testified that Puskar never told him that Puskar wanted to protect the guarantors such as Segal in case Protea defaulted on its loan. Finally, we note that there is no sworn testimony by Segal in the record on appeal, either through affidavit or deposition, that he had a conversation with Puskar where Puskar told him that the Trust had executed a guaranty for the full amount of the loan in order to protect Segal and the other guarantors, or that Puskar expected anything from Segal in return for the Trust's guaranty.

---

[52] During the June 9, 2021, hearing in the lower court, Segal's counsel also stated that the bank obtained the $3 million guaranty and collateral, and that the guaranty was for the benefit of the bank.

> Mr. Fuchs: "The bank asked the defendants to guarantee the loan. That request came from the bank, not from Mr. Puskar. … And then they also went, the bank, and got Mr. Puskar's guaranty. In addition to Mr. Puskar's guaranty, they got a pledge of significant collateral. … Mr. Puskar's $3 million guaranty was for the bank's benefit." App. 484, 490.

56

As for the Trust furnishing stock and then later a money market account as security for the loan, there is no evidence in the record that it did so as part of a bargain with the individual guarantors.[53] In fact, it appears that this collateral was tendered because of negotiations between the Trust and United, with no input from the individual guarantors such as Segal.[54] It is basic contract law that there can be no contract without offer, acceptance and consideration, *see McCormick v. Hamilton Bus. Systems, Inc.*, 175 W. Va. 222, 223 n.1,332 S.E. 2d 234, 236 n.1 (1985), and the record simply does not show a bargained for agreement between the Trust and the guarantors.[55]

---

[53] By the time of the stock pledge, Puskar, now deceased, had been replaced as sole trustee of the Trust by two other trustees. There is no evidence in the record that the new Trustees ever expressed any intent to protect or "take care of" the individual guarantors such as Segal. In fact, as early as October 2, 2012, if not sooner, the Puskar estate and the Trust were requesting to be released as guarantors on the Protea loan, and the Trust was asking for the release of its collateral. *See* App. at 642 (memorandum from Randall Williams, loan officer at United Bank, to the trustees of the Trust concerning proposed changes to the Protea loan requested by guarantors).

[54] Significantly, the Mylan stock was provided as security for not just the Protea loan, but at least two other loans as well. United's representative testified in deposition that Centra (United's predecessor) could have called in the Protea loan when Puskar died but accepted the collateral so the Trust would have time to work through various issues with Puskar's estate. There is no evidence in the record on appeal that the Trust provided stock as collateral to protect the guarantors of the Protea loan. Nor is there any evidence in the record that Puskar ever discussed collateralizing the Protea loan with any of the guarantors.

[55] As we observed in *American Bituminous Power Partners, L.P. v. Horizon Ventures of West Virginia, Inc.*, 248 W.Va. 572, ___, 889 S.E. 2d 294, 299 (Ct. App. 2023), "[a] claim for breach of contract requires proof of the formation of a contract.…" *Accord Sneberger v. Morrison*, 235 W.Va. 654, 669, 776 S.E.2d 156, 171 (2015).

Nor does the evidence concerning the alleged agreement establish the certainty of terms required to create a binding contract, s*ee Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W. 2d 339, 346 (Iowa 1999) ("To sustain proof of an oral contract, the terms must be sufficiently definite for a court to determine with certainty the duty of each party and the conditions relative to performance."), 4A Michie's Jurisprudence of Virginia and West Virginia *Contracts* §27 at 554-55 (2019) ("Another essential element of a contract is certainty and completeness. … [A contract is uncertain when one of its material terms] is expressed in so inexact, indefinite or obscure language that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect."), or a mutual understanding of, and assent to, those terms. *See Messer v. Huntington Anesthesia Group, Inc.*, 222 W.Va. 410, 418, 664 S.E. 2d 751, 759 (2008) ("The contractual concept of 'meeting of the minds' or 'mutual assent' relates to the parties having the same understanding of the terms of the agreement reached."). We therefore affirm the dismissal of Segal's counterclaim for breach of contract.[56] Having found that there was no contract

---

[56] Although we have not been directed to a specific order, all the parties agree that Segal's counterclaim for breach of contract was resolved against him and have briefed and argued this ruling for our review. However, the parties do not agree on whether Segal's counterclaim for breach of contract was dismissed under Rule 12(b)(6) for failure to state a claim upon which relief could be granted, or under Rule 56 because there was no genuine issue of material fact. On appeal, Segal stated in his opening brief that summary judgment had been granted against him, then declared in his reply brief that his counter claim had actually been dismissed under Rule 12(b)(6). Notwithstanding his position on appeal, Segal's counsel repeatedly stated on the record in the lower court that the breach of contract counterclaim was dismissed through summary judgment. For example, in Paragraph One of the Motion for Reconsideration dated August 16, 2021, he alleged that all of Segal's counterclaims had been dismissed during a hearing on motions for partial summary judgment. Similarly, during a hearing held on September 2, 2021, Segal's counsel stated

58

to begin with, we do not resolve the issue raised by PITA and the Trust that the alleged

agreement would have been unenforceable because of the statute of frauds.[57]

that the counterclaims had been lost because of a summary judgment ruling. PITA and the Trust have consistently taken the position that this counterclaim was resolved through summary judgment. Given the declarations of the parties in the lower court, and given the basis of the lower court's decision, we will treat this issue as having been resolved through summary judgment.

[57] W. Va. Code §55-1-1 provides in pertinent part that:

> No action shall be brought in any of the following cases:
>
> (d) To charge any person upon a promise to answer for the debt, default, or misdoings of another…
>
> Unless the offer, promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent. …

It is well established that the requirement of a writing signed by the person to be bound does not apply where the person derives some benefit from the transaction. *See Dolin v. Colonial Meadows, Ltd*., 635 F. Supp. 786 (S.D. W. Va. 1986) (discussing the long history and interpretation of West Virginia's statute of frauds). For example, a person who contracts with someone to construct a building and guarantees payment to a subcontractor when the contractor runs out of money to make sure that the guarantor's building is completed, benefits from guaranteeing payment. In such cases, the guarantor is said to have an "original," rather than a "collateral" promise, and that takes it out of the statute of frauds. *See* Syl. Pt. 3, *Howell v. Harvey*, 65 W.Va. 310, 64 S.E. 249 (1909). Without such a benefit, guaranty and surety agreements to pay the debt of a principal fall within the statute of frauds. 72 Am. Jur. 2d *Statute of Frauds* §113 Westlaw (database updated June 2023). But what about agreements among co-obligers to define and establish their contributive shares or for one obligor to indemnify the others? Do they constitute "a promise to answer for the debt, default, or misdoings of another" within the meaning of the statute? We leave that question, which was not briefed by the parties, for another day.

## IV. Conclusion

We affirm the lower court on the following issues:

(a) Granting summary judgment in favor of Segal on the fraudulent inducement claims asserted by PITA and the Trust

(b) Reducing the balance owed on the Protea loan by the full amount of the settlement with the Hostler's Estate, including that part of the settlement the Hostler Estate was obligated to pay from attorney fees received from possible future asbestos settlements,

(c) Holding that Segal and the Trust were equally liable for the unpaid balance of the Protea loan,

(d) Granting summary judgment in favor of the Trust on Segal's breach of contract counterclaim.

We reverse the lower court on the following issues:

(a) Granting summary judgment on behalf of Segal on PITA's claim for breach of contract; and

(b) Granting summary judgment in favor of the Trust on its contribution claim against Segal.

We remand this matter to the lower court for further proceedings consistent with this opinion so that it may determine the amount of PITA's recovery on its breach of contract claim.

Affirmed, in part, Reversed, in part, and Remanded.